139 N.J. Super. 102 (1976)
352 A.2d 609
JOHN PAZ, ROBERT PAZ AND AUGUST PISTILLI, PLAINTIFFS,
v.
ANTONIO DeSIMONE A/K/A ANTHONY DeSIMONE, JANET DeSIMONE AND CHELSEA TITLE AND GUARANTY COMPANY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 9, 1976.
*103 Mr. Joseph Mennite for plaintiffs.
Mr. John Tomasello for defendants DeSimone (Messrs. Tomasello & Driscoll, attorneys).
Mr. William R. Serber for defendant Chelsea Title and Guaranty Company (Messrs. Kirkman, Mulligan, Bell & Armstrong, attorneys).
*104 GRUCCIO, J.S.C.
Plaintiffs John and Robert Paz and one Bashaw, an attorney, as partners, entered into a contract for the purchase of the DeSimone farm. Although Bashaw, one of the original purchasers, is and was an attorney, neither side was represented by counsel. Within a few days of settlement each side engaged counsel and went to settlement. At settlement Bashaw assigned his interest to plaintiff Pistilli and although he remained at settlement his role is not otherwise explained.
The DeSimone farm qualified under the requirements of the Farmland Assessment Act, N.J.S.A. 54:4-23.1 et seq., and had therefore been assessed at its value as farmland. As such the land became subject to the provisions of N.J.S.A. 54:4-23.8 which imposes liability for "roll-back taxes" when a change in use from farmland to other is effected.
At settlement all adjustments were made and, although controverted, it appears that roll-back taxes may have been discussed but the parties were not able to agree. Purchasers' attorney said it was sellers' responsibility, and sellers' attorney insisting to the contrary, the matter was left unresolved. Nothing in the agreement of sale controlled the issue of roll-back taxes. Defendant DeSimone does not deny that he was aware of the fact that sometime in the near future the purchasers intended to change the use of the land to a racetrack. It is alleged that having failed to reach an accord as to the taxes the title company insisted that the exception for liability arising out of the Farmlands Assessment Act was to remain on the policy of title insurance to be subsequently issued. However, defendant title company through inadvertence failed to list the exception on the title insurance policy and they now seek reformation.
Thus the issues before the court are as follows: Does the credible evidence support the claim for reformation of the title insurance policy and, if so, as between a buyer and seller of lands receiving tax benefits under the Farmland Assessment Act, absent any provision in the agreement of *105 sale, who assumes the cost of added roll-back taxes assessed on a change of use from farmland to some other use?
As to the issue of reformation, the credible evidence before the court supports the title company's contention. The testimony of the title company's clerk and the revised testimony of the attorney who represented the buyers at settlement support the proposition that the exception for liability under the Farmland Assessment Act was to remain on the policy of title insurance to be issued. It has also been shown that the clerk through honest mistake did not include the exception on the marked up settlement report given the typist who typed up the issued policy.
The applicable rule of law is stated in 76 C.J.S. Reformation of Instruments § 26, p. 356:
Whenever an instrument is drawn with the intention of carrying into execution an agreement previously made, but, by reason of mistake or inadvertence of the draftsman or scrivener as to a matter of fact, it does not fulfill the intention of the parties, but violates it, there is ground to correct the mistake by reforming the instrument.
In Scult v. Bergen Valley Builders, Inc., 76 N.J. Super. 124 (Ch. Div. 1962), it is stated that "if [an] instrument as drawn and executed does not, by mistake of [the] draftsman either as to fact or law, carry into execution [the] agreement of [the] parties, equity will correct [the] mistake so as to produce conformity of [the] instrument and agreement." See also, Katchen v. Silberman, 109 N.J. Eq. 613 (Ch. Div. 1932), and Simeone v. Varloro, 107 N.J. Eq. 204 (E. & A. 1930).
I find such rule of law to pertain here and hold the insurance policy to be so reformed as to reflect the exception for liability under the Farmland Assessment Act, N.J.S.A. 54:4-23.1 et seq.
As concerns the second issue the question is one of first impression in this State.
I have reviewed the law of our sister states and do not find any guidance. The legislative history is likewise not *106 illuminating with regard to the allocation of liability for roll-back taxes. In reviewing the testimony before the Senate Committee on Revision and Amendment of Laws on April 15, 1963, I find that the new concept of farmland assessment and special tax treatment was initiated to give the farmer the incentive to continue to farm his land and to discourage the land speculator. (Emphasis supplied). However, little else appears from which we might glean definitive guidelines for the allocation of roll-back taxes.
N.J.S.A. 54:4-23.8 provides for the imposition of roll-back taxes when land which qualifies under the Farmland Assessment Act is applied to a use other than agricultural or horticultural, in an amount equal to the difference, if any, between the taxes paid or payable on the basis of the valuation authorized under the act and the taxes that would have been paid or payable had the land been valued, assessed and taxed as other land in the taxing district, in the current year and in such of the two tax years immediately preceding in which the land was valued, assessed and taxed under the act. When land qualifying under the act is applied to a nonagricultural use by the farmer as landowner, no other party being involved, the allocation of roll-back taxes is obviously the responsibility of the farmer. However, a great amount of land in our State, while legitimately qualifying under the Farmland Assessment Act, is owned by large-scale land speculators and developers. Among owners of qualified farmland are many banks, public utilities, construction, lumber, trucking and petroleum companies, as well as lawyers, doctors, dentists, brokers and other nonfarmers, the most obvious speculators, of course, being real estate companies, land developers and investment corporations. As of 1972 the Center for Analysis of Public Issues reported that speculators and developers owned a minimum of one tenth of the land under farmland assessment, for a total of at least 104,000 acres. Kolesar & Scholl, "Misplaced Hopes, Misspent Millions," at 31 (1972).
*107 As regards this widespread speculation, the typical situation occurs wherein a speculator will purchase farmland and lease it back to the farmer in order to continue to qualify for the preferred tax treatment under the act. If an immediate development is contemplated, the cost of roll-back taxes is added to the sale price of the land and is passed along from farmer to speculator to developer and ultimately to the home purchaser. However, immediate development is not the usual situation in that land speculation involves a period of years. Land speculators are not likely to resell within a year or two of their purchases and therefore the liability for roll-back taxes that arises when development occurs is either passed along to the developer or absorbed by the speculator. The three-year roll-back tax will present a small setback in comparison to the money saved during the years the land qualified for the preferred tax treatment under the act. The speculator would be in full control of the when, where and how the use will change.
It is apparent, then, that the tax benefits of the Farmland Assessment Act, serve to entire speculation and make its provisions common parlance to those involved in the buying and selling of property within its purview.
However, the instant fact situation is the anomaly wherein no provision was made between the parties for roll-back tax liability. Thus the resolution of this issue is left to the court and presents an issue of first impression.
A description of the nature of roll-back taxes can be found in N.J.A.C. 18:15-7 et seq. and 18:15-8 et seq. The language of the various provisions in defining the nature, liability, amount, computation and applicability of roll-back taxes provides affirmative guidance for the imposition of the tax. N.J.A.C. 18:15-7.1 states that "When land which is in agricultural or horticultural use and is being assessed under the act is applied to a use other than agricultural or horticultural, it is subject to additional taxes, hereinafter referred to as roll back taxes." (Emphasis supplied). N.J.A.C. 18:15-7.2, in discussing when the liability *108 for roll-back taxes applies states that "liability attaches to the land at a time a change in the use of the land occurs but not when a change in ownership takes place * * *," if farm use continues. (Emphasis supplied). N.J.A.C. 18:15-7.3 in determining the amount of roll-back taxes chargeable, refers to land that has "undergone a change in use". (Emphasis supplied). Likewise, the remaining provisions of N.J.A.C. 18:15 et seq. contain similar reference to lands which have undergone a change in use.
It would be anomalous indeed to refuse to effect the clear intent of the statute as reflected in its words. The liability for the payment of roll-back taxes is to attach upon the change in use of the land assessed under the Farmland Assessment Act. Under subchapter 8 of the Administrative Code provisions, entitled "Change of use", 18:15-8.1 states that, "when land which is being assessed under the act is applied to a use other than agricultural or horticultural, it becomes subject to roll back taxes." (Emphasis supplied). Thus we see the triggering of the imposition of the roll-back taxes is in the hands of the buyer.
The testimony of both parties clearly establishes that while defendants DeSimone had ownership and possession, the land was used only for farming and for no other purpose, thereby qualifying for the tax benefit. Subsequently, defendants and plaintiffs entered into an arms-length agreement for the conveyance of the real property. After this conveyance of the property, the sellers no longer had any right, title or interest in the property and the use of the property was totally the prerogative of the buyers constrained only by apposite governmental statutes, ordinances and regulations. Even if we were to find that the seller here had knowledge of the buyers intended change of use, to place this burden upon a farmer who has in good faith farmed his land up to the date of sale and sells his property with or without knowledge of an intended change in use at some future date and over which he no longer has control is unreasonable and intolerable. "It is not a mere change in ownership or possession that *109 triggers the imposition of roll-back taxes; it is a change in the use to which the property is applied." N.J. Turnpike Auth. v. Washington Tp., 137 N.J. Super. 543 (App. Div. 1975). Here the buyer purchased the property and in a few months changed the use of a part of the land to an auto raceway. He subsequently sold the venture to a third party within a brief period thereafter.
In the instant case the testimony clearly indicates that there was in fact no collateral agreement between seller and buyer for the seller to pay roll-back taxes, and that the seller had maintained his land as a farm qualifying under the Farmland Assessment Act up to the date of settlement and that the buyer in fact changed the use of the property to one other than farming subsequent to the date of settlement, thereby incurring liability for the payment of the roll-back taxes assessed pursuant to N.J.S.A. 54:4-23.8.