824 A.2d 1132

BOARD OF EDUCATION OF THE TOWNSHIP OF SOUTH BRUNS-WICK, MIDDLESEX COUNTY, PLAINTIFF–APPELLANT, v. RUTH CODY ECKERT, CODY ANN ECKERT, JANIS LEE EC-KERT, SEYMOUR LIFSCHUTZ, THE TOWNSHIP OF SOUTH BRUNSWICK, AND PHYLLIS LENORE LIFSCHUTZ, DEFEN-DANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 30, 2003—Decided June 17, 2003.

Before Judges CONLEY, CARCHMAN and PARRILLO.

*David W. Carroll,* argued the cause for appellant (*Parker, McCay & Criscuolo,* attorneys; *Mr. Carroll,* on the brief).

*Robert A. Gladstone,* argued the cause for respondents Ruth Cody Eckert, Janice Lee Eckert, Seymour Lifschutz and Phillis Lenore Lifschutz.

*David B. Gaynor,* argued the cause for respondent Cody Ann Eckert.

Respondent Township of South Brunswick did not file a brief.

The opinion of the court was delivered by

CARCHMAN, J.A.D.

The narrow issue that we address on this appeal is whether a property owner-condemnee is responsible for roll-back taxes when the use of such property is changed as a result of a condemnation. We answer that question in the negative and conclude that the condemning authority is responsible for such roll-back taxes. We further conclude that the cessation of farming operations in reasonable anticipation of the ensuing condemnation does not comprise a change of use warranting imposition of the roll-back taxes on the condemnee.

We reach this result in the context of the following undisputed factual circumstances. Defendants Ruth Cody Eckert, Janis Lee Eckert, Seymour Lifschutz and Cody Ann Eckert (the partners) owned 23.723 acres of land in South Brunswick Township at the intersection of 50 Deans Rhode Hall Road (the property). From 1982 through 2000, the partners leased the property to tenant farmers who grew grain crops on the land.

Pursuant to the Farmland Assessment Act (the Act), *N.J.S.A.* 54:4–23.1 to –23.34, defendants applied for and were granted

farmland tax assessment for the property. In July 1999, Jeffrey Scott, Assistant Superintendent for Business and Board Secretary to plaintiff Board of Education of the Township of South Brunswick, contacted defendant Ruth Cody Eckert to inform her that the Board desired to purchase the property to be used for the construction of a new elementary school. Scott informed Eckert that the Board had determined that defendants' site was the "most appropriate of all the sites examined."

After this initial telephone conversation, the Board moved quickly and decisively to acquire the property. In August 1999, Scott received formal approval from the Board to acquire the property, and on October 5, 1999, the voters of South Brunswick approved a referendum authorizing the expenditure of funds to purchase the property. Immediately thereafter, the South Brunswick Township Committee adopted an ordinance changing the zoning to permit school use on the property.

After all of the necessary governmental requirements were in place, the Board then entered the property. In November 1999, after the tenant-farmer Allen Habiak harvested his crops from the Spring planting, the Board took soil samples from the property. While the parties disagree as to the extent of soil excavation, backhoes were used to dig the test borings, which Habiak described as "craters" that were "eight feet" in length.[1]

Habiak's lease arrangement with defendants was "basically indefinite," and although he had only farmed the land for two seasons, his predecessor had farmed the property for approximately eighteen years. Except for the Board's intervention, defendants evidenced no intention of selling the property, and planned to continue leasing it for farm operations. In fact,

---

[1] Habiak described his farming operation as a "no-till" farming process designed to minimize disturbance of the ground. The purpose of such practice is to prevent soil erosion. Therefore despite the parties' dispute over the extent of disruption caused by the Board's excavations, the soil sampling clearly would have been disruptive to the farming operation described by Habiak.

defendants sought farmland assessment for 2001, in the event the Board decided not to pursue the school construction.

In 2000, Habiak was confronted with a dilemma. He had "prepared the lands to plant crops," expecting to farm the property, but Scott informed him that the Board planned to begin construction in early September 2000. According to Habiak, the commencement of construction in September would effectively preclude him from harvesting his soybean crop in November. Although it ultimately was Habiak's decision not to plant, he explained that he did not want to expend the money or time to plant a crop that he could not harvest. As he cogently explained: "I had nothing in writing. I didn't pursue that. I basically felt, well they are coming in September, so don't be stupid." He also rejected as not "economically feasible" any attempt to plant another crop that might be harvested in August. Defendants did not seek another tenant farmer for the 2000 growing season.

Negotiations on the purchase price for the property ultimately failed, and on September 14, 2000, the Board filed a Verified Complaint and Declaration of Taking to obtain the property through its power of eminent domain. A week later, the Board deposited $2,014,500 with the court, representing its appraisal of just compensation for the property.

In December 2000, the Middlesex County Tax Assessor filed a complaint seeking roll-back taxes on the property. The complaint described the nature of the change in use prompting the imposition of roll-back taxes as "[c]essation of farming—site work for construction of school." The assessor sought roll-back taxes for the years 2000, 1999, and 1998, totaling $142,791.18. In his certification, the assessor claimed that he did not impose the roll-back taxes solely due to the construction of the school, but also because of the cessation of farming. He later explained:

I based my complaint for roll-back taxes on two independent grounds: (1) there was evidence that farming had ceased being carried out on the property during 2000, irrespective of whether construction had started; and (2) that, even if it had been farmed, the exemption was lost because construction was an independent factual ground for invoking roll-back taxes. There was a factual basis for each

reason, and either one, standing alone, would have required the imposition of roll-back taxes. I indicated my dual and independent reasons for invoking roll-back taxes by stating on the complaint that the reason(s) were: "cessation of farming" *and* "site work for construction of a school."

Neither party challenged the assessment of roll-back taxes for 2000 and the two years prior thereto, so there was no challenge to either of my factual bases for the complaint, and no need to pick one or the other as the basis for invoking roll-back taxes when the County Board imposed the roll-back taxes.

After discovery and a hearing on a motion to determine the responsibility of the parties for the roll-back taxes, Judge Longhi, relying on *Gardiner v. State,* 196 *N.J.Super.* 529, 483 *A.*2d 442 (Law Div.1984), ordered that plaintiff Board pay the roll-back taxes.

On appeal, the Board argues that it should not bear the burden of the roll-back taxes because (1) most negotiated contracts allocate taxes as of the date of the sale, and allocating the taxes here would be consistent with the legislative intent of imposing roll-back taxes; (2) *Gardiner, supra,* was wrongly decided as its emphasis on the subjective intent of the parties, *i.e.,* speculators versus farmers, was misplaced; (3) *N.J.S.A.* 54:4–56 should apply and govern the allocation of the taxes; and (4) the change of use here preceded any filed condemnation action.

The purpose of farmland assessment under the Act is to preserve the family farm and to promote the maintenance of open space and the availability of agricultural products "fresh from the farm." *New Jersey Turnpike Auth. v. Washington Township,* 137 *N.J.Super.* 543, 546, 350 *A.*2d 69 (App.Div.1975), *aff'd,* 73 *N.J.* 180, 373 *A.*2d 652 (1977). The legislative intent of roll-back taxes is to provide a means of deterring the landowners who enjoy farmland tax assessment from changing the use of their land. *See Centex Homes of New Jersey, Inc. v. Manalapan Township,* 4 *N.J.Tax* 599, 607 (1982) (noting that the intent of the roll-back tax is "to encourage the retention of agriculture as an industry in the State and to preserve agricultural lands in an open space condition.") (quoting *East Orange v. Livingston Township,* 102 *N.J.Super.* 512, 534, 246 *A.*2d 178 (Law Div.1968), *aff'd o.b.,* 54 *N.J.* 96, 253

A.2d 546 (1969)); *see also South Brunswick Township v. Belle-mead Dev. Corp.,* 8 *N.J.Tax* 616, 623 (1987).

■ Land in "agricultural or horticultural use" and assessed taxes under the Act that is subsequently "applied to" a different use is subject to roll-back taxes for the year that the use was changed as well as the two years preceding the change in use. *N.J.S.A.* 54:4–23.8; *see also N.J. Const.* Art. VIII, § I, ¶ 1(b); *New Jersey v. Township of Washington,* 73 *N.J.* 182, 373 *A.*2d 652 (1977); *New Jersey Turnpike Auth. v. Washington Township, supra,* 137 *N.J.Super.* at 546–47, 350 *A.*2d 69.

The change in use of the land triggers the imposition of roll-back taxes. *Paz v. DeSimone,* 139 *N.J.Super.* 102, 352 *A.*2d 609 (Ch.Div.1976) (holding that sellers of land who maintained agricultural use up until the date of settlement were not obliged to pay the roll-back tax as it was the buyers who changed the use); *see also N.J. Const.* Art. VIII, § 1, ¶ 1(b) ("[W]hen land which has been valued [as farmland] for local tax purposes is applied to a use other than for agriculture or horticulture, it shall be subject to additional taxes[.]"); *N.J.A.C.* 18:15–7.2 ("The liability for roll-back taxes attaches to the land *at the time a change in the use of the land occurs,* but not when a change in ownership takes place if the new owner continues to devote the land to agricultural or horticultural use[.]") (emphasis added); *accord N.J.S.A.* 54:4–23.15. This is because the purpose of the roll-back tax is: "to give protection to the municipality against pure speculation, there be[ing] included a tax deferral or recapture feature of [three] years *at the time of a change in use of the land." Centex Homes, supra,* 4 *N.J. Tax* at 607 (quoting *Taxation of Lands Used in Agriculture or Horticulture: Public Hearing on S.C.R. 16 Before the Senate Comm. on Revision and Amendment of Laws,* at 3 (April 15, 1963)).

■ In *Gardiner,* the Law Division held that the State was responsible for roll-back taxes on farmland condemned as part of a highway project. The judge reasoned:

> These plaintiffs were not land speculators, they did not engage in either a change of use or a placing of the property on the market, but it was forcibly taken from them, albeit lawfully, by the process of condemnation permitted under the powers of eminent domain but nevertheless against their will. It is fair to state that had the plaintiffs had their way, there would have been no litigation and they would have been peacefully in possession of the farmland in question to this date.
>
> [*Gardiner, supra,* 196 *N.J.Super.* at 532–33, 483 *A.*2d 442.]

*Gardiner* stands for the general proposition that where property is being utilized for farm purposes and is entitled to the benefits of the Act, the change in use prompted by the condemnation imposes the obligation for roll-back taxes on the condemnor. In dictum, the judge distinguished between those holding the land for farming and those holding the land for speculation. *Ibid.*

The Board attempts to focus on two elements of *Gardiner* by way of distinction. It first argues that roll-back taxes are no different from any other real estate taxes and are subject to apportionment under the allocation provisions of *N.J.S.A.* 54:4–56. It also asserts that the Law Division judge overemphasized the issue of speculation, and suggests that any change in use imposes liability for roll-back taxes on the condemnee. While the Board may be correct that Gardiner's emphasis on speculators versus farmers deflects the legislative intent behind the roll-back tax, the Board is incorrect in its assertion that the roll-back taxes should be treated as regular taxes and allocated according to the length of ownership and not based on who changed the use of the land.

The Board's reliance on *Centex Homes* in support of the latter proposition is misplaced. *Centex Homes* holds to the contrary. It states:

> The available history of the amendment to the State Constitution reflects an intent to preserve farmland in the State as long as possible *even though nonfarmers or speculators could benefit along with farmers.* That objective was and is achieved so long as actual current use remains the dominant criterion.
>
> *The rollback feature was designed to provide some measure of recapture of the taxes forgiven by the amendment and to offset to a degree the expected landholding by speculators.*
>
> [*Centex Homes, supra,* 4 *N.J. Tax* at 608 (emphasis added).]

Any discussion of change of use from farm to other use in the context of land speculation carries with it the implication that such

change is voluntary and prompted by the willingness of the seller-land owner to voluntarily change the use with the attendant benefits inuring from a voluntary sale. The imposition of roll-back taxes in such circumstances is consistent with permitting farmland assessment in the first instance to preserve farms and recouping such tax benefit if the farmer chooses to abandon that use for another unrelated non-agricultural use. That is not the case presented here. Defendants demonstrated no intention to change the use. Only plaintiff's power of eminent domain intervened to cause such change. We perceive of no unfairness in imposing the burden of such change on the condemning authority rather than the reluctant landowner.

Additionally, the Board's argument that it should not bear the roll-back taxes as imposing this cost on it would be "doubly unfair" to the taxpayers who subsidized defendants while they benefitted from farmlands assessment is simply incorrect. Even the government is not immune from roll-back taxes. 43 *New Jersey Practice, State and Local Taxation* § 11.7, at 228 (Hon. David E. Crabtree) (1999); *see, e.g., New Jersey Turnpike Auth. v. Washington Township, supra,* 137 *N.J.Super.* at 547–48, 350 *A.*2d 69 (noting that prior to 1970 the Act provided an exemption for lands taken by eminent domain, but this was repealed and "such repeal bespeaks a deliberate legislative intent that lands taken by right of eminent domain no longer be so exempt[.]"); *Department of Envtl. Prot. v. Franklin Township,* 181 *N.J.Super.* 309, 336–37, 3 *N.J.Tax* 105, 437 *A.*2d 353 (Tax 1981) (noting that case law "establish[es] that property acquired by a state agency otherwise entitled to an exemption from taxation is not immune from the imposition of rollback taxes once a change in use has occurred."), *aff'd,* 5 *N.J. Tax* 476 (App.Div.1983); *cf. New Jersey v. Township of Washington, supra,* 73 *N.J.* 182, 373 *A.*2d 652 (holding that land acquired by eminent domain was subject to roll-back taxes although not deciding whether the taxes should be allocated among the property owners and governmental entity). The roll-back taxes are a consideration that any condemning authority must factor into its cost analysis for its public purpose use. The

condemning authority chose to condemn a farm for its use. It must bear the cost of such condemnation including tax obligations that are imposed as a matter of law.

We also reject the Board's reliance on *N.J.S.A.* 54:4–56.[2] That statute deals with the apportionment of taxes assessed against the property. The issue addressed by this statute would apply to a tax obligation imposed on the land and protects the condemnor from liability for taxes that are properly the obligation of the condemnee. This statute puts the calculation and apportionment of such taxes to rest. It neither addresses nor answers the issue here as to which party is responsible for roll-back taxes that arise as a result of a change in use of the property. The issue is not one of assessment or allocation but underlying legal responsibility. The roll-back responsibility is not transaction-oriented as is the operative provision of *N.J.S.A.* 54:4–56; it is change-oriented, and change in use prompts the imposition of roll-back taxes. The treatment of roll-back taxes including apportionment is addressed by the specific provisions of *N.J.S.A.* 54:4–23.9:

The assessment, collection, *apportionment* and payment over of the roll-back taxes imposed by [*N.J.S.A.* 54:4–23.8], the attachment of the lien for such taxes, and the right of a taxing district, owner or other interested party to review any judgment of the county board of taxation affecting such roll-back taxes, shall be governed by

---

2 *N.J.S.A.* 54:4–56 provides:

Upon the sale and transfer for a valuable consideration or the acquisition through eminent domain or similar proceedings of any real estate in this state, unless otherwise provided in a written agreement between the seller and purchaser or the parties in said proceedings or unless otherwise expressly stipulated, the seller or owner of property to be acquired shall be liable for the payment of such proportion of the taxes for the current year upon the property to be conveyed or so acquired as the time between the previous January first and the date of the delivery of the deed by the seller to the purchaser or the date the condemning body acquired its title bears to a full calendar year. If the amount of the taxes for the current year shall not have been determined at the time of the delivery of the deed of conveyance or the taking of its title by the condemning body, the amount of the taxes last previously assessed against such real estate shall be used as the basis for computing the apportionment herein provided.

the procedures provided for the assessment and taxation of omitted property under [*N.J.S.A.* 54:4–63.12]. [*N.J.S.A.* 54:4–23.9 (emphasis added).]

"It is a well established precept of statutory construction that when two statutes conflict, the more specific controls over the more general." *New Jersey Transit Corp. v. Borough of Somerville*, 139 *N.J.* 582, 591, 661 *A.2d* 778 (1995); *VW Credit, Inc. v. Coast Auto. Group*, 346 *N.J.Super.* 326, 343, 787 *A.2d* 951 (App. Div.), *certif. denied*, 172 *N.J.* 178, 796 *A.2d* 895 (2002); *Meadowlands Basketball Assoc. v. Director, Div. of Taxation*, 340 *N.J.Super.* 76, 82, 773 *A.2d* 1160 (App.Div.2001).

We likewise reject plaintiff's argument that by failing to continue the farming into the 2000 planting season, defendants had changed the use of the property. Such view is unrealistic. Plaintiff caused a change in the zoning to permit school use, secured funding through a referendum approving the school construction, entered the property previously for soil samples and test borings and advised Habiak that construction would commence prior to the November harvest. To require Habiak to expend capital knowing that he would not reap the benefits of his efforts would require a futile (and expensive) act that any concept of equity and fair play will not countenance. Habiak relied on Scott's statements and plaintiff's course of conduct. The use was neither changed nor altered by the failure to farm in 2000. In sum, plaintiff is estopped from relying on the conduct that it prompted. *See Miller v. Miller*, 97 *N.J.* 154, 163, 478 *A.2d* 351 (1984) ("To establish a claim of equitable estoppel, the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action."); *State v. King*, 340 *N.J.Super.* 390, 399, 774 *A.2d* 629 (App.Div.2001) (noting that "to invoke the doctrine of equitable estoppel, the equities must weigh in favor of the party seeking its protection.").

Plaintiff's reliance on a series of Tax Court cases involving the cessation of farming as a change of use prompting the imposition of roll-back taxes is misplaced. *See, e.g., South Brunswick Township v. Bellemead Dev. Corp., supra*, 8 *N.J.Tax* at 624–25 (holding

that "not only the case law, but also the provisions and underlying objectives of the Farmland Assessment Act, compel the conclusion that a change from agricultural to non-use constitutes a change in use pursuant to *N.J.S.A.* 54:4–23.8."); *Burlington Township v. Messer*, 8 *N.J.Tax* 274, 283 (Tax 1986) (imposing roll-back tax on land that had not been farmed in over a year, concluding that "*Paolin* stands for the proposition that where previously qualified farmland continues in farmland activity but fails to meet the minimum income requirements by reason of the farmer's illness ... it is not subject to roll-back taxes."), *aff'd o.b.*, 9 *N.J.Tax* 634 (App.Div.1987); *cf. Jackson Township v. Paolin*, 181 *N.J.Super.* 293, 307–08, 3 *N.J.Tax* 39, 437 *A.2d* 344 (Tax 1981) (noting that roll-back taxes should not be imposed until the land was applied to a "more intensive use."). No one disputes the basic proposition that a change in use prompts the imposition of roll-back taxes. The circumstances of such change resulting from the exercise of the power of eminent domain prompts the inquiry as to which party shall be responsible for such tax burden.

We conclude that the narrow holding of *Gardiner* applies here. The change from farm use to a public purpose, supporting the use of eminent domain that prompts the imposition of roll-back taxes, requires that the burden of such change be borne by the condemnor, and we so hold. Plaintiff must bear the responsibility for roll-back taxes.

Affirmed.